IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | No. 3:18-cv-00386-HZ |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| ROBERT M. MORANO, | |
| Defendant. | |

**HERNANDEZ, J.**

In this enforcement action brought by Plaintiff U.S. Securities and Exchange Commission, Defendant Robert M. Morano has stipulated to entry of judgment against him for illegal insider trading. Judgment, ECF No. 8. The Judgment permanently enjoins Defendant from violating § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Defendant has agreed to disgorge $38,242 in illicit trading profits, plus prejudgment interest of $2,317.

Plaintiff now moves for the imposition of a civil monetary penalty of $114,726, which is three times Defendant's illicit profits, the maximum penalty allowed under the Insider Trading

Sanctions Act, 15 U.S.C. § 78u-1.  Defendant, who is representing himself, opposes a civil penalty.

The parties agree that this court will decide whether to impose a civil penalty and, if so, the amount of the penalty.  Defendant agrees that (1) he is "precluded from arguing that he did not violate the federal securities law as alleged in the Complaint"; (2) he "may not challenge the validity" of the Consent or the Judgment; (3) for purposes of Plaintiff's motion for civil penalties, "the allegations of the Complaint shall be accepted as and deemed true" by this court; and (4) this court "may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment" in Federal Rule of Civil Procedure 56(c).  Judgment 4.

For the following reasons, I grant Plaintiff's Motion for Monetary Penalty and order that Defendant pay a penalty of $75,000.

## BACKGROUND

In 2010, Defendant began working for UTi Worldwide, Inc. (UTi) as a senior communications specialist, working remotely from his residence in Portland, Oregon.  Compl. ¶ 9, ECF No. 1.  UTi was "a global supply chain services and solutions company . . . incorporated in the British Virgin Islands and based in Long Beach, California."  Compl. ¶ 10.  UTi's common stock was registered with Plaintiff and traded on the NASDAQ.

Defendant testified at his deposition that his "role [at UTi] was to basically develop or assist in the development of marketing and corporate communications messages and content for internal, meaning employee, or external, meaning customers or the general public" through

emails, newsletters, brochures, or online postings. Morano Dep. 20, ECF No. 20-2. Under his employment agreement and UTi policy, Defendant "had a duty not to trade on or otherwise misuse confidential information." Compl. ¶ 12. UTi prohibited its employees from "using material nonpublic information for personal gain in connection with trading in UTi securities." Compl. ¶ 12. Defendant "received training on [UTi's] insider trading policy and affirmed that he read and understood the policy." Compl. ¶ 12.

For several weeks in fall 2015, UTi negotiated privately with DSV Air & Sea Holdings A/S (DSV), a Danish company seeking to acquire UTi. Compl. ¶¶ 10, 11, 13. On October 8, 2015, DSV and UTi agreed that DSV would acquire UTi for $7.10 per share. Compl. ¶ 13. "The acquisition price represented a premium of 50% over the market price of UTi stock, and valued the acquisition at approximately $1.35 billion." Compl. ¶ 13. DSV and UTi planned to announce the agreement publically the next morning, October 9, 2015.

On the afternoon of October 8, 2015, a UTi executive notified Defendant by phone about DSV's pending acquisition of UTi. Compl. ¶ 14. Defendant was to assist in preparing the announcement of the acquisition. The UTi executive told Defendant "that the information was confidential and instructed him to strictly maintain the confidentiality of the information about the acquisition until after the public announcement the very next day." Compl. ¶ 15.

Immediately after the phone call, Defendant "logged on to three separate brokerage accounts that he controlled and purchased in the open market a total of 17,515 shares of UTi." Compl. ¶ 16. Defendant paid an average of $4.78 per share.

The next day, October 9, 2015, DSV and UTi announced DSV's purchase of UTi at $7.10 per share. After the announcement, UTi's share price increased more than 50% on heavy

trading. UTi stock closed that day at $7.13 per share. Compl. ¶ 17. The next day, Defendant sold his UTi shares, realizing $38,242 in illicit profits from the sale.

In May 2017, Plaintiff's investigators telephoned Defendant to ask about his purchase of UTi stock on October 8, 2015. During the phone call, Defendant told Plaintiff's investigator that he was only a "peon" with UTi, and did not have access to insider information about DSV's acquisition. Morano Dep. 16. Defendant later testified at his deposition that during the initial conversation with Plaintiff, he "downplayed" his knowledge of the acquisition, in part because he "recognized, at least on a subconscious level, that I had done something that I shouldn't have done and was unwilling to acknowledge or admit that to myself, much less to someone whose identity I wasn't sure about," i.e., Plaintiff's investigator. Morano Dep. 19. Defendant testified that he "sensed that it was wrong, that I had an unfair advantage, but I really thought an insider was a registered officer, or fiduciary, or someone with a 5 percent or more . . . I thought I knew that it was wrong sort of morally or ethically, but okay legally because, well, I'm not an insider, so this isn't insider trading." Morano Dep. 34.

Defendant also testified that he had traded UTi's stock about eight or nine times before his October 2015 trades. Defendant testified that in early September 2015, he received a copy of a press release on UTi's earnings before the release was made public, and he

> took it as good news and bought the stock. I really think that I waited until the
> press release crossed the wire, but that may not -- I've seen standards of two days
> -- two business days for the information to become nonpublic, even though it's
> been announced . . . giving the public two days to absorb it and respond to it,
> which I certainly did not do.

Morano Dep. 41. Plaintiff apparently lost money on his September 2015 trading of UTi's stock. Fitzsimmons Decl., Ex. 2, ECF No. 20-3.

# LEGAL STANDARDS

Congress authorizes Plaintiff to seek civil penalties in this court against persons who commit insider trading. 15 U.S.C. § 78u-1(a)(1). "The amount of the penalty which may be imposed on the person who committed such violation shall be determined by the court in light of the facts and circumstances, but shall not exceed three times the profit gained or loss avoided as a result of such unlawful purchase, sale, or communication." 15 U.S.C. § 78u-1(a)(2).

The statute defines "profit gained" or "loss avoided" as "the difference between the purchase or sale price of the security and the value of that security as measured by the trading price of the security a reasonable period after public dissemination of the nonpublic information." 15 U.S.C. § 78u–1(e). "In other words, the statutory penalty amount is tethered to the profits—the statute 'make[s] the amount of financial liability to which a violator of the insider trading laws may be exposed directly proportional to the amount of the profit gained or the loss avoided' from the purchase or sale of a security." *SEC v. Sabrdaran*, 252 F. Supp. 3d 866, 904 (N.D. Cal. 2017) (quoting *SEC v. Rosenthal*, 650 F.3d 156, 162 (2d Cir. 2011) (citing 15 U.S.C. § 78u–1(a)(2)). Congress authorized civil penalties "to 'enhance deterrence against insider trading, and where deterrence fails, to augment the current methods of detection and punishment of this behavior.'" *SEC v. Happ*, 392 F.3d 12, 32 (1st Cir. 2004) (quoting H.R. Rep. No. 100-910, at 7 (1988), reprinted in 1988 U.S.C.C.A.N. 6043, 6044)).

The parties did not cite, and I did not find, Ninth Circuit decisions on determining civil penalties for insider trading. *See Sabrdaran*, 252 F. Supp. 3d at 905. District courts in this and other circuits have used the following six-factor test to aid in determining civil penalties:

> "(1) the egregiousness of the violations; (2) the isolated or repeated nature of the violations; (3) the defendant's financial worth; (4) whether the defendant

concealed his trading; (5) what other penalties arise as the result of the defendant's conduct; and (6) whether the defendant is employed in the securities industry."

*SEC v. Gowrish*, No. C 09-5883 SI, 2011 WL 2790482, at *9 (N.D. Cal. July 14, 2011) (quoting *Happ*, 392 F.3d at 32), *aff'd*, 510 F. App'x 588 (9th Cir. 2013). "Ultimately, after considering these factors, the court has discretion to impose a monetary penalty that goes beyond disgorgement of illegal profits to serve the goal of deterrence." *Sabrdaran*, 252 F. Supp. 3d at 905 (footnote omitted) (citing, inter alia, *SEC v. Sargent*, 329 F.3d 34, 42 n.2 (1st Cir. 2003); *SEC v. Henke*, 275 F. Supp. 2d 1075, 1083 (N.D. Cal. 2003)).

## DISCUSSION

I use the six-factor test described above as a framework for determining the civil penalty. Defendant acknowledges that under his agreement with Plaintiff, he is "constrained from disputing" "Plaintiff's presentation of the facts," but contends that he may "clarif[y] and supplement[]" the facts. Def.'s Opp'n 1, ECF No. 21. I consider Defendant's factual assertions to the extent they are relevant and consistent with his prior stipulation.

### I. Egregiousness of Violations

Plaintiff contends that Defendant's conduct was egregious in light of his role with UTi, "the trust placed in him by the company executive [who told him about the acquisition], and his knowledge that he had a duty and obligation to not trade on the information . . . . [Defendant] placed his financial interest above his duty to the company and innocent investors." Pl.'s Reply 4. Furthermore, when Defendant first talked to Plaintiff's investigators, he lied about his advance knowledge of DSV's acquisition, showing his awareness that his conduct was illicit.

In response, Defendant asserts that he is a "gaming/gambling addict," suffering from "an

irrational compulsion" to trade stocks online. Def.'s Opp'n 5, 7.[1] Defendant has not provided evidence to support his claim to be a compulsive trader, other than his own assertions, and Plaintiff states that Defendant refused to answer interrogatories about his alleged addiction.

The parties dispute whether Plaintiff's exhibit showing Defendant's stock trades between January 2016 and March 2018 is evidence of Defendant's alleged trading addiction. Fitzsimmons Decl., Ex. 4. Plaintiff argues that this exhibit shows Defendant made less than one trade per day of fewer than five securities per month. Defendant responds that although the exhibit states that it covers his stock trades for a total of 65 months, it covers trades for 27 months, from January 2016 through March 2018. Because the exhibit lists Defendant's trades per month separately for each of his three accounts, Plaintiff's calculations do understate the number of trades Defendant made per month. For example, for January 2016, the exhibit shows Defendant made almost two trades per day (12 trades of 4 securities in account no. 3579; 12 trades of 7 securities in account no. 5332; and 35 trades of 11 securities in account no. 2341). However, although Plaintiff may understate the frequency of Defendant's trades per month, this does not affect my analysis of the egregiousness of Defendant's conduct. Defendant purchased UTi's stock on October 8, 2015 specifically because he had insider knowledge of DSV's acquisition of UTi. Similarly, Defendant purchased UTi's stock in September 2015 specifically because he had insider knowledge that UTi was issuing an earnings report. I agree with Plaintiff that Defendant "made the trades because he was greedy--despite admittedly knowing that his conduct was unfair, improper, and unethical." Pl.'s Reply 6.

Defendant argues that although he received training from UTi on the prohibition against

---

[1] Defendant states that he has not traded stocks since about April 2018. Def.'s Opp'n 7.

insider trading, he does not recall the training. Defendant also asserts that he mistakenly thought the prohibition against insider trading did not apply to him because he was not a "publicly designated insider[] who could get in trouble if [he] didn't follow certain rules concerning [his] trading and reporting." Def.'s Opp'n 4. However, Defendant has stipulated that he read and understood UTi's insider trading policy, and that a UTi executive told him that information about DSV's acquisition was confidential. Compl. ¶¶ 12, 15. Furthermore, Defendant lied to Plaintiff's investigators about his knowledge of DSV's acquisition, showing an awareness that his conduct was illegal. Plaintiff states that Defendant admitted he knew his stock trading was illegal only "after being presented with the overwhelming evidence of his illegal conduct." Pl.'s Mem. 4. I find that the egregiousness factor weighs in favor of imposing a civil penalty.

## II. Isolated or Repeated Nature of Violations

Here, Defendant made three illicit trades of UTi's stock on October 8, 2015. Defendant also traded UTi's stock on September 3, 2015 in an unsuccessful attempt to exploit his insider knowledge of UTi's earning statement. This factor weighs in favor of imposing a civil penalty. *See SEC v. Megalli*, Civ. No. 1:13-cv-3783-AT, 2015 WL 13021472, at *4 (N.D. Ga. Dec. 15, 2015) (finding the defendant's conduct was not isolated when he "violated securities laws on two occasions over roughly ten months").

## III. Defendant's Financial Worth

Plaintiff has submitted a checking account statement for Defendant for June 28 to July 27, 2018. Fitzsimmons Decl., Ex. 3. The statement indicates that Defendant had about $50,000 in his checking account. The statement also shows two direct deposits of $2,623.36 each in July 2018, apparently indicating Defendant was paid a monthly salary of about $5,250. Plaintiff

states that it has no further information about Defendant's employment because he "refused to provide substantive responses to propounded interrogatories." Pl.'s Mem. 9 n.1.

Defendant responds that his financial worth "is less than $50,000 and is shared jointly with his wife, whose income . . . is negligible." Def.'s Opp'n 8. Defendant states that his "currently employment is likely to be terminated at any time, both as a result of this matter and for reasons unrelated to it, and his prospects for any career in a salaried professional position are likely and perhaps deservedly nil." Def.'s Opp'n 8. However, Defendant has not submitted evidence about his current employment. I find that Defendant has an adequate income and reserves to pay a civil penalty, so this factor weighs in favor of imposing a penalty.

## IV. Concealment

Defendant argues he did not try to structure or otherwise conceal his trading in UTi stock. However, although the "focus of this factor tends to be concealment of the trading itself . . . it may also include making misstatements to the SEC to hide misconduct." *SEC v. Sabrdaran*, 252 F. Supp. 3d 866, 906 (N.D. Cal. 2017); *SEC v. Yun*, 148 F. Supp. 2d 1287, 1297 (M.D. Fla. 2001) (noting the defendant "engaged in misstatements to SEC investigators in order to obfuscate any misconduct"). Here, Defendant tried to conceal that he traded UTi's stock based on his insider knowledge of DSV's acquisition. This factor weighs in favor of imposing a civil penalty.

## V. Other Penalties

Defendant has agreed to disgorge his illicit profits, and to pay prejudgment interest on that amount, but he has not incurred penalties for his conduct, such as criminal fines. This factor favors imposing a civil penalty.

## VI. Employment in Securities Industries

Defendant was employed by a publicly traded company, although not one in the securities industry. This factor weighs is neutral.

## VII. Settlement Negotiations

Defendant contends that after he had agreed to disgorgement and entry of judgment against him, Plaintiff breached the parties' agreement by seeking a civil penalty in addition to disgorgement. Def.'s Opp'n 7. Plaintiff responds that Defendant's argument about the parties' settlement negotiations should be stricken because it violates Federal Rule of Evidence 408. Rule 408 "prohibits the admission of compromise offers and negotiations to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction, but allows the admission of such evidence 'for another purpose.'" *Memory Integrity, LLC v. Intel Corp.*, 308 F.R.D. 656, 660 n.4 (D. Or. 2015). As examples of other purposes justifying admitting such evidence, Rule 408 mentions "proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."

I agree with Plaintiff that Defendant's assertions about the parties' settlement negotiations are not admissible under Rule 408. Even if this court were to consider Defendant's assertions, Defendant has not presented evidence that Plaintiff agreed not to seek a civil penalty against Defendant. Plaintiff explains that during insider trading investigations, it may consider waiving a monetary penalty based on the potential defendant's financial condition, which the defendant may show through a sworn statement and other documentation. Pl.'s Reply 5. Plaintiff states that it did not approve a waiver for Defendant because of his assets and his

employment. Plaintiff states that after staff explained to Defendant "on countless occasions that it can only propose the waiver and the settlement terms," but Plaintiff had the "ultimate authority to determine whether a payment should be waived for financial reasons, and whether to accept a settlement offer." Pl.'s Reply 5-6. Plaintiff further states that Defendant refused to agree to a monetary penalty despite being offered extended payment terms. I find that Plaintiff did not breach any agreement with Defendant.

Defendant also asserts that Plaintiff "received more cooperation from the Defendant than even it wanted," and that Plaintiff "arguably has pursued him only and exactly to the extent he has cooperated with its speculative, haphazard and altogether bureaucratically insensible and avaricious prosecution of this affair." Def.'s Opp'n 10. Plaintiff responds it obtained "overwhelming evidence to support its claims through documentary evidence obtained from the company, discussions with the company's general counsel, and testimony and documentary evidence obtained from the company executive" who notified Defendant about the pending acquisition of UTi, and that Defendant chose to discuss settlement "[o]nly after appreciating the overwhelming evidence against him." Pl.'s Reply 7. Given these circumstances, I find that Defendant's cooperation during the investigation does not affect the penalty determination.

## VIII. Determining the Civil Penalty

Defendant argues that disgorgement is a sufficient sanction for his insider trading. I disagree. Congress authorized civil penalties for insider trading because "disgorgement alone merely restores a defendant to his original position without extracting a real penalty for his illegal behavior." *SEC v. Afriyie*, 16-cv-2777 (JSR), 2018 WL 6991097, at *6 (S.D.N.Y. Nov. 26, 2018) (citations and quotation marks omitted); *see also Megalli*, 2015 WL 13021472, at *3

("While disgorgement returns a defendant to his status quo before he violated the law, a civil penalty punishes the individual defendant and warns others against engaging in future securities violations."). I conclude that a civil penalty is warranted here.

Plaintiff moves for the maximum penalty of $114,726, three times Defendant's illicit profits. I conclude that a penalty of about two times Defendant's illicit profits, $75,000, is appropriate.

Although decisions on civil penalties for insider trading are tied to the particular facts of each case, I conclude that decisions imposing three-times penalties generally involve more egregious conduct than occurred here. For example, a court imposed a three-times civil penalty when the defendant, a vice president of a savings and loan association, "caused [the bank] to disseminate false and misleading financial statements, engaged in unauthorized securities transactions, altered bank's books to hide losses, appropriated $3.5 million from [the bank] and sold stock at an inflated price before the fraudulent scheme became public." *SEC v. Chapnick*, No. 90-6793-CIV-PAINE, 1994 WL 113040, at *1 (S.D. Fla. Feb. 11, 1994). Another court imposed the three-times penalty when the defendant conducted an insider trading scheme for several weeks based on his knowledge of a pending corporate acquisition, making multiple trades, concealing his conduct, and tipping others. *SEC v. Ferrero*, No. IP 91 271 C, 1993 WL 625964, at *19 (S.D. Ind. Nov. 15, 1993), *aff'd sub nom. SEC v. Maio*, 51 F.3d 623 (7th Cir. 1995); *see also SEC v. Kinnucan*, 9 F. Supp. 3d 370, 377 (S.D.N.Y. 2014) (imposing three-times penalty when the defendant showed "a high degree of scienter" after pleading guilty in a parallel criminal prosecution for "recurrent conduct over a period of two years"); *SEC v. Patton*, No. 02 CV 2564 (SJ), 2008 WL 2388261, at *2 (E.D.N.Y. June 11, 2008) (imposing three-times penalty

when the defendant realized $59,830 in illicit insider trading profits; court did not apply the six-factor test), *amended on other grounds*, 2009 WL 54563 (E.D.N.Y. Jan. 8, 2009).

I conclude that a two-times penalty is appropriate. Defendant's conduct was egregious, betraying his employer's trust for personal gain. Defendant lied about his knowledge and cooperated only after being shown evidence of his illicit conduct. Defendant has cash reserves and is employed. Defendant states that his wife's income is "negligible," but he does not mention dependents. Def.'s Opp'n 8; *cf. SEC v. Pardue*, 367 F. Supp. 2d 773, 778 (E.D. Pa. 2005) (imposing $25,000 penalty despite SEC's request for $139,697 penalty because the defendant had a negative net worth and a large family to support). The penalty here serves as punishment and deterrence. *See SEC v. Drucker*, 528 F. Supp. 2d 450, 453 (S.D.N.Y. 2007) (imposing two-times penalty of $394,486 when the defendant betrayed his employer's trust, tried to conceal his conduct through structured trades, failed to cooperate with the investigation "until his back was literally against the wall," and committed perjury at trial), *aff'd*, 346 F. App'x 663 (2d Cir. 2009).

## CONCLUSION

Plaintiff's Motion for Monetary Penalty Against Defendant, ECF No. 20, is GRANTED. Defendant is ordered to pay a monetary penalty of $75,000. Plaintiff is to submit a proposed final judgment in accordance with this Opinion and Order.

IT IS SO ORDERED.

DATED this ___ day of April, 2019.

MARCO A. HERNANDEZ
United States District Judge